IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

DANIEL ATKINS,           )
                         )
    Petitioner,         )
                         )
v.                       )    Civil Action No. 3:23-cv-565–HEH
                         )
HAROLD W. CLARKE,        )
                         )
    Respondent.         )

**MEMORANDUM OPINION**
**(Granting Respondent's Motion to Dismiss)**

Petitioner Daniel Atkins ("Atkins"), a Virginia inmate proceeding with counsel, filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions in the Circuit Court of Westmoreland County ("Circuit Court") of two counts of forcible sodomy of a child under the age of thirteen. Atkins contends that he is entitled to relief on the grounds that he was denied the effective assistance of counsel.[1] Specifically, Atkins asserts that:

    A.    "Trial counsel solicited incriminating evidence from X and without this evidence Atkins could only have been convicted of one count instead of two." (ECF No. 1, at 12.)

    B.    "Trial counsel failed to object to an inadmissible internet report on Atkins' search history." (*Id.* at 15.)

    C.    "Trial counsel failed to clarify Krystal Richards's testimony that Atkins slept in X's room twice a week." (*Id.* at 18.)

---

[1] For the sake of privacy, the Court employs "X" for the victim. The Circuit Court's opinion has been edited to reflect this abbreviation. For ease of reading, this edit is reflected without alterations.
    The Court employs the pagination assigned by CM/ECF. The Court corrects the spelling punctuation, and capitalization and omits emphasis in the quotations from the parties' submissions.

    D.      "Defense counsel's cumulative errors – the numerous evidentiary, factual, and legal deficiencies created a reasonable probability that, had these errors not occurred, Atkins would have been acquitted." (*Id.* at 20.)

Respondent has moved to dismiss. Atkins has responded. For the reasons set forth below, the Motion to Dismiss (ECF No. 6) will be granted.

## I. Applicable Constraints Upon Federal Habeas Review

To obtain federal habeas relief, at a minimum, a petitioner must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") further circumscribes this Court's authority to grant relief by way of a writ of habeas corpus. Specifically, "[s]tate court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence." *Gray v. Branker*, 529 F.3d 220, 228 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). Additionally, under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was adjudicated on the merits in state court unless the adjudicated claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that the question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410

2

(2000)). Given the foregoing restrictions, the findings of the Circuit Court figure prominently in this Court's opinion.

## II. Initial Procedural History

Atkins was charged with the three counts of forcible sodomy of his daughter X, a child under the age of 13 at the time of each act. (ECF No. 7-10, at 343.) The first count charged that the act occurred on or about November 2, 2018. (*Id.*) The second count charged that the act occurred on or between August 4, 2018 and November 1, 2018. (*Id.* at 344.) Similarly, the third count charged that the act occurred on or between August 4, 2018 and November 1, 2018. (*Id.* at 345–46.) The jury found Atkins guilty of Counts One and Two and not guilty of Count Three. (*Id.* at 396; ECF No. 1-2, at 3.) Atkins was sentenced to life in prison. (*Id.* at 4.)

On direct appeal, Atkins asserted the Circuit Court "erred by granting a motion *in limine* allowing the Commonwealth to introduce evidence extracted from his phone of his internet history and internet search history to show his motive to commit the crimes or his feelings toward the victim." (ECF No. 1-2, at 5.) Atkins asserted that "the search history was not factually related and in violation of the rules of evidence against propensity evidence." (*Id.* at 5.) In rejecting that challenge, the Court of Appeals of Virginia made the following relevant findings:

> After the victim reported the allegations, City of Colonial Beach Police Department Captain Sara Lombrana obtained a search warrant for appellant's cell phone. State Police Special Agent Cook extracted information from the phone and prepared extraction reports addressing the websites appellant had accessed and the internet search request history recovered from the phone. The reports included the dates and times the internet searches were done, the websites that were accessed, search terms

3

> appellant used to search for the videos, and the titles of the pornographic videos accessed. The search history introduced at trial was limited to the time frame of the indictments in the case.
>
> Appellant's phone contained internet search requests made on a pornographic website using the search terms "daughter" and "brutal." In addition, a list of videos that appellant accessed on the phone were introduced at trial. When the search term "daughter" was used for a video search on a pornographic website, the titles of the videos accessed on the phone included: "Don't fuck my 18 year old daughter"; "Japanese mom gets fucked by her daughter's teacher . . . with the daughter watching!"; "Mom watches daughter get hard banged"; "Daughter wants daddy's cock"; "Sweet teen daughter"; "Step dad playfully fucks daughter"; "Daughter sex with dad as mom watch [sic]"; "Daughter gets freaky"; "Teen daughter does her doting daddy"; "StepDad fucks his 2 daughters next to Mom"; "Hot daughter wants his cum"; "Dad fucking friend while daughter sleeps"; and "Dad and daughter fuck hard to cum." Appellant also conducted a search on a pornography website using the phrase "Daddy forces teen daughters to fuck," and a video was accessed after this search. A Virginia State Police digital forensic examiner testified that he accessed the websites shown on appellant's phone and that they did not contain child pornography.
>
> In its analysis of the issue, the trial court stated that two factors were important in its decision--appellant accessed the websites during the time that he was charged with committing sodomy against his daughter, and the evidence was offered to prove motive and appellant's conduct and feelings toward his daughter. The trial court ruled that the evidence was relevant and was admissible at trial.
>
> . . . .
>
> However, in this case, appellant searched the terms "daughter" and "brutal" on pornography websites and accessed the videos whose titles involved sexual acts against daughters. This evidence tended to prove appellant's motive and his attitude, feelings, and conduct toward his minor daughter against whom he was accused of committing sodomy. For example, one of the search phrases appellant used was "daddy forces teen daughter to fuck," and one of the accessed video titles was, "Dad fucks daughter while mom sleeps." Similarly, the evidence presented at trial showed that appellant repeatedly sodomized his minor daughter at night in their home where the child's mother also resided. Under these circumstances, the trial court did not abuse its discretion in admitting the challenged evidence.

(ECF No. 8, at 6–8 (alteration in original).) Subsequently, the Supreme Court of Virginia refused Atkins's petition for appeal. (*Id.* at 1.)

4

On June 22, 2023, Atkins, by counsel filed a petition for a writ of habeas corpus with the Circuit Court, wherein he raised the same claims as presented in his § 2254 Petition. (*Id.* at 11.) The Circuit Court provided the following summary of the evidence and proceedings at trial:

> In the fall of 2018, X lived in a house in Colonial Beach with Atkins, Krystal Richards (her mother), her brother, her uncle, and her grandfather. Atkins, Richards, and the two children had moved back to Colonial Beach from Florida in August 2018.
> At trial, ten-year-old X testified that in early November 2018, she saw the "Hugs and Kisses" play at her school. X's guidance counselor described the play as teaching children about "good touch," "bad touch," and "secret touch." After the play, X disclosed to the counselor that Atkins had "secret touched" her since she was two-years-old.
> X testified that the abuse generally occurred in her bedroom. X testified that the Friday before she saw the play, Atkins came into her room at night. She got into "cat pose" with her clothes off, a position she described wherein her butt was in the air with her hands stretched in front of her. X testified that Atkins stood behind her with his clothes off. He placed his hands on her hips, with his thumbs on her back. X stated that Atkins penetrated her anus with his penis. X said that it felt "[w]eird." At some point, Atkins stopped and wiped his penis with a paper towel. Atkins gave X a paper towel to clean "[s]omething like drool from her butt." Atkins told X, "Don't tell anyone."[2]
> Following X's disclosure, a forensic nurse examiner examined X. The forensic nurse testified that X had bruises on her lower back, on both sides of her spine. The nurse examiner also noted anal fissures and a dilated anus, which was unusual in a child X's age, which may have been caused by anal penetration. At a follow-up visit ten days later, following a period of time in which X did not see Atkins, the nurse examiner observed that the anal fissures were healing, and there was less anal dilation.
> X testified that Atkins sodomized her more than once. She also stated that the abuse occurred in the bathroom, as well as in her bedroom. She testified that Atkins had sodomized her "many times."

---

[2] At trial, the Commonwealth played a video of X's interview with a forensic interviewer for the jury, which was admitted into evidence as Commonwealth's Exhibit 9.

>        Following X's disclosure, the Colonial Beach Police Department executed a search warrant at the residence and interviewed Atkins.[3] During the interview, Atkins denied touching X inappropriately, and he stated that he did not sleep in X's room. Atkins gave police his cell phone. The Virginia State Police extracted data from Atkins' phone, including his text messages, browser history, and search history.
>        Tom Heflin, a digital forensic examiner with the Virginia State Police, testified about the data from Atkins' phone. He stated that Atkins had searched for "daughter" and "brutal" on a pornographic website several times from August to November 2018. Heflin also testified that Atkins viewed pornographic videos with titles like "Mom Watches Daughter Get Hard Bang," "Horny Dad Fucks Daughter's Friend," "Daughter Wants Dad's Cock," "Stepdad Playfully Fucks Daughter," "Daughter Sex with Dad as Mom Watched," "Teen Daughter Does her Doting Daddy," "Hot Daughter Wants His Cum," "Daddy Forces Teen Daughters to Fuck," "Stepdad Fucks his Two Daughters Next to Mom," "Dad Fucking Friend While Daughter Sleeps," and "Dad and Daughter Fuck Hard to Cum."
>        At trial, Richards testified that Atkins slept in X's room twice a week. Richards agreed that it was "fair to say that there were a number of times that [Atkins] was alone in the room with [X]."

(ECF No. 1-2, at 11–13 (first footnote omitted) (alterations in original).)

## III. Analysis

To demonstrate ineffective assistance of counsel, a convicted defendant must first show that counsel's representation was deficient, and, second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, a convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for

---

[3] The Commonwealth played the video interview of Atkins for the jury at trial.

6

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, the Court need not determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### A. Claim A

In Claim A, Atkins contends that counsel performed deficiently when counsel elicited incriminating testimony from X on cross-examination. Atkins asserts that without the additional incriminating testimony from X on cross-examination, he would have only been convicted of a single charge of sodomy. Specifically, Atkins argues that:

> During X's testimony, she could not remember whether the alleged sexual abuse happened more than one time in Virginia. Tr. 162. On direct examination, X only testified regarding abuse one time in the bedroom. On cross examination, trial counsel inexplicably solicited evidence that the sexual abuse also happened in the bathroom. Tr. 180–82. Atkins was convicted of two counts of sexual abuse because of the evidence that was solicited by trial counsel on cross examination, thus trial counsel's performance was deficient, and Atkins was prejudiced.

(ECF No. 1, at 13.)

X's testimony on direct left no doubt that she had been sodomized by Atkins. How many times she had been sodomized by Atkins was less clear. On direct, the following relevant exchange occurred:

> Prosecutor: Now, you had lived in Florida for a little while, while you were in the third grade, right?
> X: Yeah. For like about one year.
> Prosecutor: Okay. And then you moved back to Colonial Beach, right?
> X: Yes.

7

> . . . .
> Prosecutor: Okay. And so, you talked about one time your dad putting his penis in your butt, did that happen more than one time?
> X: Yes.
> Prosecutor: Did it happen at least three times since you moved back from Florida?
> X: Kinda.
> Prosecutor: Do you remember?
> X: I forgot.
> Prosecutor: Okay. How often would it happen?
> X: Sometimes.
> Prosecutor: Okay. Did it happen more than one time since you moved back from Florida?
> X: Yes. Kind of.
> Prosecutor: Okay. If you don't remember, it's okay to say you don't remember.
> X: I don't remember.

(ECF No. 7-9, at 160–162.)

In rejecting this claim on state habeas, the Circuit Court began it analysis by reciting the relevant part of counsel's cross-examination of X:

> [COUNSEL]: So, that's all the detail you remember from those nights or that night?
> [X.]: Yeah.
> Q: And you said that it happened once, but you don't remember how many other times. Do you remember saying that just a few minutes ago?
> A: Kind of.
> Q: Do you remember saying previous to today, telling people it happens every other day?
> A: Yeah.
> Q: Do you remember saying that?
> A: Yeah.
> Q: And you did say and write down that it happened when you were two, right?
> A: Yeah.
> Q: And that it happened frequently thereafter, or continued to happen from the age of two, is that right?
> A: Yes.
> Q: And when, but you don't remember any other specific events from, let's say August of last year, until that Hugs and

8

Kisses play. Do you remember any other time in that period of time?
A: No.
Q: So, the only event that you remember, and that you are testifying today, is the one event where you initially said it happened on Friday, is that right'?
A: Yeah.
Q: I couldn't hear your answer?
A: Yeah.
Q: But you also said it could have happened on that Sunday?
A: Kind of, yeah.
Q: And it could happen on a Sunday, and at some point, you said it happened in the bathroom and not the bedroom, is that right?
A: It happened in the bedroom. I just got very nervous and said bedroom.
Q: That that event that preceded, or the one that was closest in times to the Hugs and Kisses play, you are saying happened in the bathroom?
A: Yes.
Q: Okay. So, you weren't on your bed?
A: No. Yeah, yeah.
Q: Okay. And in the bathroom, where were you in the bathroom?
A: Like next to the tub.
Q: Next to the tub?
A: Yeah.
Q: Where were you next to the tub?
A: Like by the wall, near the window.
Q: So, is the tub, is the tub, if there is a tub that is in front of me, directly in front of me, is it an outside wall with the window on the other side of the tub?
A: Like this is the tub, and that is the window. (witness indicating)
Q: Okay. The subject is, the window is on a different wall than where the tub is?
A: Yes. It's like next to the tub. You step a little outward from the tub. It's like next to the sink, too.
Q: Okay. And so you, how were you next, on that wall, how were you positioned[?]
A: Cat pose.
Q: So were you on the ground?
A: Yes.

9

Sept. 23, 2019 transcript at 179–82.

(ECF No. 1-2, at 15–17.)

The Circuit Court then went on to explain why this cross-examination was a reasonable part of counsel's overall trial strategy.

> Counsel explained in his opening statement to the jury that part of his strategy was to discredit X. Specifically, counsel stated: "You will also hear that she [X] remembers being born. She remembers coming out and that there was a light. You will also hear that she has said the facts differently, meaning that when, recounting the story, details change[.]" In other parts of cross-examination, counsel attempted to impeach X with her prior inconsistent statements and discredit her:
> [COUNSEL]: That's fine. But you remember telling them about something that happened that Friday before, is that right?
> [X]: Yeah.
> Q: Do you remember earlier in this week. Well, let's first, do you remember ever saying that it happened on the Sunday before the play?
> A: Yeah. Something like that.
> Q: So you were a little confused about the day is that right?
> A: Yeah.
> Q: And then do you remember just maybe like a week ago you said it actually happened in the bathroom, do you remember telling someone that?
> A: Yes.
> Q: And then they corrected you and you said, oh, no, it happened in the bedroom, is that right?
> A: Yeah.
> Q: I mean, if I'm getting something wrong, you let me know.
> A: I was confused.
> Q: Okay. And you said that this has been going on a long time, is that right?
> A: Yeah.
> Q: Since the, I guess your note says since the age of two, is that right?
> A: Yeah. The year of two.
> Q: The year of two?
> A: Age.
> Q: The age of two?
> A: Age.

10

> Q: When you say the age of two, you will remember being two?
> A: Yes.
> Q: How far back does your memory go?
> A: A long time.
> Q: What is the first thing you remember?
> A: The first thing I remember is when I was a child. I just threw up on the ground.
> Q: You threw up on the ground? Do you remember ever saying you remember being born?
> A: Kind of, yeah.
> Q: Do you remember being born?
> A: (witness nodded her head).
> Q: You have to say yes or no, so this nice lady can take down your responses[.]
> A: Yes.
> Q: And you also remember a long time ago when you threw up on the ground. How old do you think you were when you threw up on the ground?
> A: One years old.
> Q: One year old?
> A: Something like that.
> Q: What about you being born, do you remember?
> A: There is nothing really much to say. Confusing.
> Q: It was confusing at the time or confusing as a question?
> A: The first thing I saw was me like saying people's name.
> Q: And when was that?
> A: I don't know.
> Q: You don't know. You just started saying people's names and that's what you remember?
> A: That's the first thing that I saw, and that's the first thing that I remember when I was young, young, young. First thing that I saw.

Sept. 23, 2019 transcript at 172-75.

When counsel cross-examined Richards, counsel asked about X's reputation for truthfulness. Richards replied that X's reputation for truthfulness was "[n]ot a very good one" because X "has a tendency to stretch the truth or lie a little bit." Counsel also asked the grandfather about X's reputation for truthfulness. The grandfather testified that X had a history of "telling stories."

Accordingly, counsel's cross-examination of X was part of an overarching strategy to discredit X and impeach her testimony with prior inconsistent statements. In closing argument, counsel argued, in part:

11

> This child talked about how her story has changed. She admitted that she, at one point, said it was in the bathroom, once said it was in the bedroom. She said it happened on a Friday, then she said it happened on a Sunday. So, her story has changed.
>
> \*\*\*
>
> [The Commonwealth] talk[s] about how does a child know this information? You also heard that, her say she does lie a lot. Her brother taught her. In that CAC [Child Advocacy Center] interview she talks about lying. And the specific question that when she is asked about lying, are you lying now, in the CAC interview, she doesn't provide an answer, she changes the subject, talks about something different. Whereas on the stand, yesterday, she says, no, I'm not lying.
>
> \*\*\*
>
> [X] didn't give specific dates, specific times. She was not specific about that November 2nd date. And that's a requirement of the one charge. You have to believe beyond a reasonable doubt that it happened on that day. She is not specific. There is no other evidence to corroborate that day. No other evidence at all to say this happened on the 2nd. So you have to believe her words out of her mouth solely.
>
> With the ones that have a range, she, as you heard her say, she, because that's all they have is this, a range of time it happened, but no specifics.

Sept. 24, 2019 transcript at 362–63, 365, 379–80.

Accordingly, Atkins has not demonstrated that counsel's performance was deficient because the testimony he asserts counsel ineffectively elicited was part of an overarching effort to discredit X, which was a reasonable trial strategy. *See Matthews v. Evatt*, 105 F.3d 907, 921 (4th Cir. 1997) (deferring to trial counsel's tactical decisions); *Wolfe v. Clarke*, 819 F. Supp. 2d 538, 560-61 (E.D. Va. 2011) (observing that impeaching witnesses is a valid trial strategy). Moreover, this Court defers to counsel's discretion in cross examining witnesses. *See Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997) ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."); *see also Thomas v. Clarke*, No. 2:19cv479, 2020 U.S. Dist. LEXIS 146423, at \*48-49 (E.D. Va. June 30, 2020) (observing that decisions concerning trial strategy are "virtually unchallengeable").

Moreover, Atkins has failed to demonstrate prejudice. Atkins contends that without this testimony, the jury would not have convicted him of a second count of forcible sodomy. Atkins' argument overlooks X's

12

> testimony on direct examination that the sodomy occurred more than once and had been ongoing since she was two-years-old.
> On direct examination and on cross-examination, X testified about the specific date charged in the indictment that the abuse occurred. On redirect examination, X said that Atkins had sodomized her "many times." Accordingly, Atkins has failed to demonstrate a reasonable probability of a different outcome at trial because X testified to an ongoing pattern of abuse and abuse concerning the single date charged. As such, this Court dismisses Claim A.

(ECF No. 1-2, at 17–22.) X's testimony on direct and during the Child Advocacy Center Interview[4] reflected that Atkins had sodomized X on November 2, 2018, and indicated that Atkins had sodomized X multiple times prior to that date, although the dates of those prior incidents was far from certain. One of the last things X told the interviewer at the Child Advocacy Center was, "I don't want my daddy to go to jail, I just want him to stop." (Commonwealth Exhibit 9.) This again suggests a pattern of abuse, rather than an isolated incident. Given this evidence, and that recited by the Circuit Court, counsel's cross-examination, while not perfect, was reasonable. In light of this record, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's conclusion that Atkins failed to demonstrate deficiency or prejudice. *See* 28 U.S.C. § 2254 (d)(1)–(2). Accordingly, Claim A will be DISMISSED.

### B. Claim B

In Claim B, Atkins faults counsel for failing to object to an allegedly inadmissible report regarding the internet searches Atkins conducted from his phone. The reports were

---

[4] The Child Advocacy Interview is on a compact disk marked Commonwealth Exhibit 9 from the state criminal trial record.

created by Special Agent Cook.[5] Atkins contends, "Cook did not testify, however, so the report was inadmissible both because it was hearsay and on Confrontation Clause grounds." (ECF No. 1, at 16.)

> In rejecting this claim, the Circuit Court initially stated that Atkins
>
> has failed to articulate how the reports were inadmissible hearsay. As such, he has failed to carry his *Strickland* burden. Moreover, Atkins has failed to show that the cell phone extraction reports were not accurate or that a reasonable probability of a different outcome existed had trial counsel required the Commonwealth to call a witness to authenticate the records. Accordingly, Atkins has failed to satisfy either prong of the *Strickland* test and this sub-claim of Claim B is dismissed.
>
> Turning to the Confrontation Clause argument, Atkins cites *Crawford v. Washington*, 541 U.S. 36 (2004), for the proposition that because Cook created the reports, and he did not testify, then the Commonwealth violated his Confrontation Clause rights.
>
> The United States Supreme Court has held: "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009). However, the Confrontation Clause applies only to the "admission of testimonial statements of a witness." *Crawford*, 541 U.S. at 53-54. The United States Court of Appeals for the Fourth Circuit has explained that raw data is not testimonial. *See United States v. Washington*, 498 F.3d 225, 229–30 (4th Cir. 2007) (holding that machine printout of raw blood sample data not testimonial, and lab technicians who generated data not required to testify to satisfy Confrontation Clause); *see also United States v. Hill*, 35 F.4th 366, 389 (5th Cir. 2022) (citing cases). Cell phone extraction reports are raw data. *See Hill*, 35 F.4th at 390 (finding that cell phone extraction reports are raw data and not testimonial in nature); *State v. Galeana Ramirez*, 432 P.3d 454, 459 (Wash. Ct. App. 2019) (same). *But see People v. Porras*, No. B290165, 2020 Cal. App. Unpub. LEXIS 412, at *40 (Cal. Ct. App. Jan. 21, 2020) (assuming extraction report testimonial).
>
> Accordingly. the cell phone extraction reports are raw data and not subject to the Confrontation Clause. Counsel, therefore, had no basis to challenge the admissibility of this evidence on that ground, meaning his

---

[5] The reports are Commonwealth Exhibits 35 and 36 in the state criminal trial record.

14

> performance was not deficient.[6] *See Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) (stating that counsel is not required to file futile motions); *Correll v. Commonwealth*, 232 Va. 454, 470, 352 S.E.2d 352, 361 (1987) (holding counsel had no duty to object to admission of presentence report because it was admissible).
>
> Atkins also cannot demonstrate prejudice. Although the reports were admitted into evidence during the lead investigator's testimony, Heflin, who testified as an expert in digital forensic examination, interpreted them. As such, Heflin testified as to the reports, and Atkins was able to, and did, cross examine him. Heflin testified that he did not generate the report. To the extent that the lead investigator testified as to the text messages, Atkins was also able to, and did, cross examine her. Accordingly, Atkins has failed to demonstrate prejudice because the witnesses who actually interpreted and testified as to the evidence were subject to cross examination, satisfying Atkins' Confrontation Clause rights. To the extent that Atkins asserts that the records may not be authentic, he has failed to show that the cell phone reports were not accurate or that a reasonable probability of a different outcome existed had trial counsel required the Commonwealth to call a witness to authenticate the records. This Court dismisses Claim B.

(ECF No. 1-2, at 22–23.) It is not apparent from the record, whether the prosecution and defense counsel had agreed that the report could be introduced without the presence of Special Agent Cook. But in any event, the Circuit Court essentially concluded that Atkins could not demonstrate prejudice because if he had objected, he failed to demonstrate that the prosecution could not produce Special Agent Cook to introduce the records and explain how he generated them.[7] Given that finding, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the

---

[6] Moreover, even if the extraction report was testimonial, Atkins has failed to demonstrate that Cook was unavailable at trial, and he, therefore, failed to carry his *Strickland* burden. *See Smith v. Brown*, 781 S.E.2d 744, 749 (Va. 2016).

[7] Given this determination, it is unnecessary to determine whether in the absence of testimony from Cook, the reports were inadmissible hearsay.

15

Circuit Court's conclusion that Atkins failed to demonstrate deficiency or prejudice. *See* 28 U.S.C. § 2254 (d)(1)–(2). Accordingly, Claim B will be DISMISSED.

### C. Claim C

In Claim C, Atkins faults counsel for failing to clarify Krystal Richards's testimony regarding Atkins sleeping in X's room. In rejecting that claim, the Circuit Court stated:

> On direct examination, Richards testified that Atkins slept in X's room "[a]bout two times a week, maybe." Richards agreed with the prosecutor's statement that it was "fair to say that there were a number of times that [Atkins] was alone in the room with [X]." Atkins contends that the Commonwealth made much of this testimony and argued that he lied to police when he said he never slept in X's room. Atkins asserts that counsel should have clarified Richards' testimony. In an affidavit appended to the petition, Richards states that she
>> did not mean that [Atkins] slept there the whole night, just that he fell asleep there. I meant my answer literally, that [Atkins] slept in [X]'s room about twice a week. But what I meant was only that he would fall asleep very briefly. After that he would get up and leave, he did not fall asleep there very long ever.
>
> Pet'r's Aff.
>
> As noted above, this Court defers to trial counsel concerning cross examination. *See Henderson*, 118 F.3d at 1287 ("Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."); *see also Thomas*, 2020 U.S. Dist. LEXIS 146423, at *48–49 (observing that decisions concerning trial strategy are "virtually unchallengeable"). Moreover, counsel acted reasonably because Richards' statements were relatively straightforward, and further questioning may have been harmful. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) ("The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of ineffectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case.").
>
> Moreover, even if counsel had clarified Richards' testimony to conform with her affidavit, that still established that there were periods of time that Atkins was alone with X in her room, as acknowledged by Richards. In addition to Richards' testimony, the Commonwealth introduced text messages between Atkins and Richards, which established, *inter alia*, that

16

> Atkins' cell phone clip was located in X's room and that X needed to clean her room because Atkins almost broke [his] neck going to pee this morning[.] A reasonable fact finder could infer from this evidence that Atkins spent the night in X's room and was leaving the next morning. Counsel was, therefore, reasonable for not further questioning Richards because there was reason to believe that her testimony would not be helpful. Accordingly, Atkins has failed to demonstrate prejudice because Richards' affidavit does not establish a reasonable probability of a different result at trial, given that there were periods of time Atkins was alone with X in her room, even if he did not spend the night there. As such, this Court dismisses Claim C.

(ECF No. 1-2, at 25–26.) As observed by the Circuit Court, even if Richards had clarified her testimony, it still left Atkins ample opportunity to abuse X. Moreover, any clarification by counsel would not have significantly diminished the fact that Atkins lied to the police about the time he spent *alone* in the room with X. During his interview with the police, Atkins emphasized to the police that he was seldom, if ever, alone with X in her room.

> CAPTAIN LOMBRANA: Do you ever stay in there with her when she has bad dreams?
> MR. ATKINS: No, she will go upstairs and sleep with us a couple times, but she ends up between the wall and Krystal.
> CAPTAIN LOMBRANA: You never like rock her in bed?
> MR. ATKINS: No. No. I feel like that is probably mommy's job.
> CAPTAIN LOMBRANA : Yeah. Okay. Okay.
> MR. ATKINS: You know, I'm supposed to be that strong, protective type, you know what I'm saying. So, I go in there and give her a kiss on the forehead and say everything is going to be okay, and mommy will sit there are make her feel better.

(ECF No. 7-10, at 65.)

> CAPTAIN LOMBRANA: And you never come into her room and sit on her bed?
> MR. ATKINS: No. The most I will do when she is asleep is poke my head in the door and make sure she is asleep. And she sleeps with her lights on, so it's real easy to tell if she is asleep or not.

17

(*Id.* at 70–71.)

> During her testimony, Richards testified as follows:
>
> Q   Did X's dad ever sleep in her room?
> A   By request, yes.
> Q   About how often? And when you say by request, that was at X's request?
> A   Yes.
> Q   And when you say that he slept in her room, when he slept in her room, did you sleep in her room, too?
> A   No, I have never slept in her room.
> Q   And when you say that X requested he sleep in her room, about how often would he sleep in her room?
> A   About two times a week, maybe .
> Q   So, would it be fair to say that there were a number of times that the defendant was alone in the room with X?
> A   Yes.
> Q   And if he had told detectives that any time he went into X's room, you were always with him, would that be the truth?
> A   I was in the living room, so I was close by, so I don't know.
> Q   Did you go into the room with him every time he went to X's room?
> A   To say good night to her, but that was about it.

(*Id.* at 228–29.) Even Richards's revised testimony reflects that Atkins was not truthful with the police regarding how much time he spent alone with X in her bedroom. In light of these circumstances, the Court discerns no unreasonable application of the law and no unreasonable determination of the facts in the Circuit Court's conclusion that Atkins failed to demonstrate deficiency or prejudice. *See* 28 U.S.C. § 2254(d)(1)–(2). Accordingly, Claim C will be DISMISSED.

### D. Cumulative Prejudice

In Claim D, Atkins contends that the cumulative effect of counsel's errors resulted in prejudice. Atkins's attempt to demonstrate cumulative prejudice fails, as Atkins fails to demonstrate multiple acts of counsel were constitutionally deficient. *Fisher v.*

18

*Angelone*, 163 F.3d 835, 853 (4th Cir. 1998) ("'[A]n attorney's acts or omissions 'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996))). Accordingly, Claim D will be DISMISSED.

### IV. Conclusion

Atkins's claims will be dismissed. The Motion to Dismiss (ECF No. 6) will be granted. The § 2254 Petition will be denied. The action will be dismissed. A certificate of appealability will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: Sep. 13, 2024
Richmond, Virginia

19